United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America,<br>Plaintiff<br><br>v.<br><br>Nidal Waked Hatum,<br>Defendant. | )<br>)<br>)<br>) Criminal Case No. 15-20189-CR-Scola<br>)<br>)<br>) |

### Order Denying Defendant's Motion to Dismiss

  This Cause came before the Court upon Defendant, Nidal Waked Hatum's, motion to dismiss the Indictment (ECF No. 66) based on an alleged violation of Waked's Sixth Amendment right to a speedy trial. Waked essentially claims that the Court must dismiss the indictment against him for the same reasons this Court dismissed the indictment against Waked's prior co-defendant, Tamas Zafir (Mot. ECF No. 20; Ord. ECF No. 34). But the Government failed to present any testimony or evidence in opposition to Zafir's motion and the Court accepted the unrebutted proffer of Zafir. Here, the Court conducted an evidentiary hearing and heard extensive testimony and legal arguments on Waked's motion on June 20, July 19, and July 20, 2017. The Court has considered the motion, the Government's response (ECF No. 71), Waked's reply (ECF No. 93), the credible evidence and testimony, the record, and the relevant legal authorities. For reasons set forth more fully below, the Court **denies** the motion (**ECF No. 66**).

### 1. Background

  On March 24, 2015, the Government charged Waked, co-defendant Tamas Zafir, and two corporations by sealed indictment. The charges against Waked consist of three counts: (1) one count of money laundering conspiracy, allegedly occurring from January 2000 until February 9, 2009; (2) one count of money laundering conspiracy, allegedly occurring from January 2008 until December 25, 2011; and (3) one count of bank fraud, allegedly occurring from November 21, 2007, until February 9, 2009. (Indictment, ECF No. 3.) Thus, Waked's alleged involvement in criminal activity ended in late 2011.

  The Drug Enforcement Administration ("DEA") began investigating Waked and two of his Miami-based companies, Star Textile Manufacturing and Global World, in approximately 2006. When DEA special agent Troy Naredo joined the investigation in April 2009, the DEA recently had obtained over ten years of the two corporations' financial records from Ocean Bank. Naredo, a licensed Certified Public Accountant and a Certified Fraud Examiner, began reviewing those records. This records review led to a grand-jury subpoena in approximately

November 2009, which resulted in the DEA obtaining over 250,000 pages of business records. Naredo spent several months matching the bank and business records. Again, based on that review, the DEA made a Multi-lateral Assistance Treaty ("MLAT") request to several banks in Panama, which were utilized by Waked's Panama-based company, Vida Panama. Over the next two years, until 2012, the DEA obtained in a "piecemeal rollout" over 6,000 pages of documents—mostly unreadable, incomplete, unorganized, and in English, Spanish, and other languages.

Throughout 2012, Naredo conducted a review of all of the documentary evidence received up to that point. Then, the DEA determined that it was necessary to interview bank officials from the Panamanian banks because the records review had revealed the possibility that Waked had used banks accounts in the United States and Panama to move illicit monies. These interviews actually took place in approximately February 2014. One of the Panamanian bank officials admitted that the bank had additional records that had not been turned over to the DEA. As a result, the DEA prepared a second MLAT request and received a response in approximately September 2014—but the records again were nearly unreadable and in non-English. Naredo traveled again to Panama to interview the bank officials.

Finally, after years of investigation, the DEA was able to refer the matter to the Department of Justice for possible prosecution.

Waked argued that the Government's pre-indictment investigation could have been conducted more quickly. In support of this contention, he presented the testimony of Marta Alfonso, a forensic accountant at a private firm. Alfonso testified that she would have been able to index the 11,949 documents received as a result of the two MLAT requests in 27 working days. However, Alfonso did not take into account the time required to study and forensically review those documents. Alfonso also did not realize that there were 97 boxes of documents the DEA needed to review before referring the matter for prosecution. Nor had Alfonso ever participated in an investigation to determine if there was proof beyond a reasonable doubt of the guilt of a particular person. Thus, her testimony did not in any way support Waked's contention.

At the time of the indictment, Waked was a Panamanian citizen living in Panama, which does not extradite its citizens. Naredo then began preparing to arrest Waked in another country. In order to begin the extradition processes, the DEA must prepare a provisional arrest warrant ("PAW"), required for the United States to arrest an individual in a foreign country with which the United States has an extradition treaty. A PAW request must contain a great deal of information related to the indicted charges and the evidence in the case, despite the fact the indictment remained under seal. The DEA did not prepare the PAW

at the time of the indictment, however, because the DEA had serious concerns that if a PAW for Waked were issued this information could be leaked to Waked in Panama. The DEA had information that Waked was extremely wealthy and had contacts in government who could alert him to the existence of the PAW. The information in the PAW would divulge the contents of the sealed indictment, and thus would have motivated Waked to cancel any pending international travels and remain in Panama.

Naredo learned that Waked travelled to Canada, Colombia, and China. Naredo further learned that Waked was a native-born citizen of Colombia, a resident of Canada, and had legal status in Spain. The DEA began to consider the possibility and relative efficacy of extradition from Canada, Colombia or China. The DEA quickly rejected the possibility of extraditing Waked from China, where Waked had no residency or status and where the extradition process could be very lengthy and difficult. Naredo was unaware that the United States has a separate extradition treaty with Hong Kong.

The DEA extensively explored extradition from Canada. Naredo and his supervisors spoke with DEA officers and their supervisors in Canada. Extradition from Canada presented two overriding concerns: (1) the likelihood that Waked would be released on bond in Canada; and (2) the length of time from arrest to extradition in Canada. Magdalena Boynton, the Director of Mexico, Central American, and the Spanish-speaking Caribbean for the Office of International Affairs ("OIA") who previously supervised the OIA's Colombia desk, and Kenneth Harris, an Associate Director for the OIA who has handed international affairs for Canada and the English-speaking Caribbean since 2013, testified regarding Canada's extradition process.

Harris considered it highly likely that Waked—a permanent resident of Canada, whose wife, mother-in-law, and father-in-law, are all Canadian citizens, and who was charged with white-collar crimes—would be released on bond pending the extradition. In Canada, the vast majority of white-collar and narcotics defendants are released on bond. The DEA believed that even if Canada were to have imposed as bond condition that Waked surrender one of his passports, Waked still had other passports with which he could leave Canada. Even if the Canadian authorities took all his travel documents, Waked had the financial resources to fugitate from Canada. The DEA understood and took into consideration that if Waked were to flee Canada after being released on bond, then he most likely would return to Panama from where he was non-extraditable.

Next, the DEA determined that Canada's complex and demanding extradition system often caused the extradition process to extend up to ten years. Harris noted that of the thirty individuals extradited from Canada to the United States in 2017, approximately fifteen cases took over five years to exhaust

the extradition process in Canada, and almost all of those cases lasted more than two-and-a-half years. First, Canada does not always proceed with a PAW in non-violent, white-collar cases, and may instead require a full extradition request simply to arrest the individual.

Once an arrest occurs, Canada then employs a two-track system of judicial proceedings and ministerial proceedings. In the judicial proceeding, a court makes a determination as whether or not the requirements of the Canadian Extradition Act have been satisfied. This is a lengthy process where the courts request a great deal of information. The process can be delayed even further if the individual requests a postponement—which the courts often grant. Moreover, the courts allow the defendant to conduct discovery, which in Canada is governed by more exacting standards than in the United States. Once a judicial determination has been issued, the case goes to the Minister of Justice, who is required to deny extradition if certain circumstances are present. Defendants may seek appeal of both the judicial determination and the Minister's opinion. If the appellate court decides that the Minister failed to consider certain information, the case will return to the ministerial phase before returning to the appellate court. A defendant may choose to waive the extradition process. But waiver, while not unusual, is not the norm—most defendants fight extradition from Canada.

Juliana Greenspan, a criminal defense attorney in Toronto, testified that she has handled thirty to forty extraditions, nearly all involving extraditions between Canada and the United States. Greenspan believes that Waked likely would not have been released on bond if arrested in Canada because he could not show that he was actually residing there and because he had access to financial resources and multiple passports. Greenspan, however, could not dispute Harris's testimony that Canada is among the most procedurally demanding in the world or that extraditions can be delayed for up to ten years. The Court thus finds Harris's testimony more reliable. In short, many risk factors existed in the Canadian extradition process.

On the other hand, the extradition process in Colombia would allow a more rapid and reliable extradition. Boynton stated that the time period for typical extraditions from Colombia runs from nine to eighteen months—with eighteen months as the time frame for a contested extradition. Boynton was not aware of any extradition taking longer than two years. Waked's Colombian attorney, Ricardo Calvete, similarly noted that the non-expedited extradition process lasts between one year and one-and-a-half years. The Colombian government rarely seeks additional information or asks additional questions prior to issuing the provisional arrest warrant. In fact, Colombia has extradited over 2,000 individuals since 1991 and has extradited its own citizens since 1997.

The Colombian system does not provide defendants mechanisms to circumvent the extradition process. Notably, Colombia does not grant bond to defendants held pending an extradition.

The DEA thus determined that seeking extradition in Colombia was the best option for a speedy arrest and extradition of Waked which would bring Waked to Miami for a speedier trial than an arrest in Canada. Naredo believed that the lengthy delay in the extradition process likely to occur in Canada would hurt the prosecution of the case and that release on bond presented a true risk of flight. Even Waked's witness, retired Deputy United States Marshal Irving Brandt, noted that the length of time it would take to extradite someone and the possibility of flight are factors he would consider in deciding where to arrest that person. Although the DEA had some concern that Waked did not travel as frequently to Colombia as he did to Canada, Naredo knew that Waked had influential family members in Colombia and that Waked's family was very close-knit. However, Naredo also noted that if an inordinate amount of time passed without any travel to Colombia, the DEA would have considered arresting Waked in Canada.

The DEA also discussed alternatives to extradition in order to arrest Waked, including luring Waked to the United States with a travel visa and arresting Waked on an international flight while en route over United States air space. These alternatives did not constitute serious avenues to effectuate Waked's arrest. First, the testimony and evidence left entirely unclear whether any travel visa applications for Waked, other than Waked's denied humanitarian visa request, remained pending in the time after the indictment. The DEA has no authority to issue visas. Even if it could somehow pressure the State Department or the Department of Homeland Security to issue a visa to Waked, the sudden issuance of a visa with no pending application likely would alert Waked, making him more cautious about leaving Panama, and—according to the United States' country attaché—potentially could cause a rift in diplomatic relations with Panama. The Court also finds that the Government acted appropriately in not approving his visa request to accompany his daughter for a life-saving liver transplant. While there is one mention in his request about the "parents" of the child's involvement in the travel, there was much credible evidence to suggest to the Government that Waked would be traveling alone with the child and the Government properly determined that it would be inappropriate to arrest Waked at the border and leave his deathly ill, two year old child without a family member to arrange for her liver transplant.

Second, Gary Miller, the Acting Director of System Operations Security for the Federal Aviation Administration ("FAA"), testified he has never heard of a law enforcement agency making a request to divert an international flight over U.S.

airspace to effectuate an arrest and unequivocally stated that the FAA would *never* authorize an aircraft diversion for the purposes of arresting a fugitive.

In an effort to arrest Waked, the DEA began tracking Waked's travel plans with the assistance of Adam Mastrianni, special agent of the Federal Bureau of Investigation ("FBI"). Although Naredo began communicating with the FBI shortly after the return of the indictment, he received no actionable information from Mastrianni until late October 2015. Many times, Mastrianni provided travel information only one day before Waked's flight or even after Waked already had landed at his destination.

In January 2016, the DEA discussed luring Waked into Colombia to effectuate an arrest there. The plan could not be done, however, because the confidential information could not obtain Waked's travel information and could not participate without revealing his or her identity. Then, on February 5, 2016, Naredo learned from Mastrianni via email that Waked was in Colombia with no return flight information on file.

Although the DEA could have attempted to obtain an emergency warrant for Waked's arrest in Febraury 2016, such an approach presented numerous logistical obstacles. First, as Boynton testified, Colombia might issue an emergency PAW within a day or two of a request from the United States. However, Colombia reserves emergency PAWs for truly urgent situations, such as the arrest of a terrorist, serial murderer, or an extremely violent individual. The arrest of an alleged drug kingpin would not justify the issuance of an emergency PAW. Moreover, the DEA would need to know the exact location of the fugitive in Colombia. In February 2016, Naredo did not receive advance notice of Waked's travel plans, had no way to locate Waked once he left the airport, and had no notice of the length of Waked's visit to Colombia.

Ultimately, the DEA received notice through a wiretap that Waked would be traveling to Colombia on May 4, 2016. The DEA arrested Waked in Colombia on that day. Waked waived fighting extradition and requested an expedited extradition process. The extradition request was granted on September 15, 2016, by the Colombian Ministry of Justice. However, on October 4, 2016, Calvete moved for an order clarifying the extradition order. The Ministry took two months to respond—noting in its order that Waked's request was not necessary. Waked was then returned to the United States after spending eight months in custody in Colombia.

In total, a little more than three years passed between the end of Waked's alleged role in the conspiracy and the date of indictment, and slightly more than thirteen months passed between the date of the indictment and the date of arrest. Thus, a total of fifty-two months passed between the end of Waked's alleged participation in the conspiracy and the date of his arrest. Notably, this

time span is considerably less than the eighty-nine–month total pre- and post-indictment delay at issue in Zafir's case.

## 2. Legal Analysis

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Amend VI. Charges against a defendant who has been denied his constitutional right to a speedy trial must be dismissed. *Strunk v. United States*, 412 U.S. 434, 440 (1973). The Court must evaluate four factors to determine whether a delay constitutes an infringement on a defendant's right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) the prejudice to the defendant. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006); *see also Barker v. Wingo*, 407 U.S. 514, 530 (1972). Further, if the first three factors all weigh heavily against the government, then the Court will presume the fourth factor, prejudice to the defendant, without a showing of actual prejudice. *Ingram*, 446 F.3d at 1336.

### A. Initial Considerations

As an initial matter, Waked has argued that the Court should reach the same conclusion in the present motion to dismiss as it reached in co-defendant Zafir's motion to dismiss. On October 17, 2016, the Court dismissed the indictment against Zafir based on the *Barker* speedy-trial analysis. However, as the Court will discuss more fully below, the speedy-trial analysis as to Zafir necessary differs from the analysis as to Waked.

First, in Zafir's case, Zafir was living openly within the Southern District of Florida at the time of the indictment. Yet, the Government made no efforts to arrest Zafir and *intentionally* delayed Zafir's arrest to ensure Waked's arrest before unsealing the indictment. Second, at the hearing on Zafir's motion, the Government opted to present no evidence to this Court to demonstrate its diligence in arresting Waked or Zafir. So, for example, Zafir proffered that Waked could have been arrested by having an international flight on which he was a passenger diverted so that Waked could have been arrested. Since Miller did not testify at that hearing, the Court was left to presume that this would have been a successful way to have arrested Waked earlier. Also, Zafir's participation in the alleged conspiracy ended long before Waked's participation, resulting in a considerably shorter delay in Waked's case.

### B. Length of the delay

A delay exceeding one year constitutes a "presumptively prejudicial" delay. *Doggett*, 505 U.S. 647, 652 (1992). Once the first factor triggers the speedy trial analysis, "it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the government."

*Ingram*, 446 F.3d at 1339. Here, the delay of slightly more than thirteen months, while not extraordinary, does constitute a presumptively prejudicial delay and requires the Court to consider the three-year pre-indictment delay. However, the Court finds that the total pre- and post-indictment delay of fifty-two months only moderately inures against the Government.

### C. Reasons for the delay

"Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner the burden is on the prosecution to explain the cause of the pretrial delay." *Ingram*, 446 F.3d at 1337 (internal citations, quotations, and ellipsis omitted). Where the Government raises the need to locate and arrest the defendant as one of the reasons for a post-indictment delay, the Sixth Amendment requires only that the government employ a "diligent, good-faith effort" to arrest the defendant and bring him to trial. *United States v. Spaulding*, 322 F. App'x 942, 946 (11th Cir. 2009) ("[I]f the government pursues a missing defendant with reasonable diligence from his indictment to his arrest, then no speedy trial violation exists." (citing *Doggett v. United States,* 505 U.S. 647, 656 (1992))). If the Government acts less than diligently, but with mere negligence, that "is a more neutral reason that counts less heavily against the Government." *Id.* (internal citation and quotations omitted); *see also United States v. Demirtas*, 204 F. Supp. 3d 158, 189 (D.D.C. 2016) ("But, while it is tempting to read the record with the benefit of hindsight and with the benefit of expert testimony, the requirement that the government use 'reasonable diligence' in pursuing a defendant located overseas does not mean that the government's efforts must be flawless." (citing *Doggett*, 505 U.S. at 656)). Finally, a court also must consider whether a defendant's actions contribute to any delay. *Ingram*, 446 F.3d at 1337.

Here, the Government presented ample evidence that it diligently sought Waked's arrest after the indictment was returned and it made a reasoned decision to pursue extradition in Colombia. The testimony clearly showed that extradition in Colombia took substantially less time and bore significantly less risk of flight than extradition in Canada. Between the date of the indictment and the date of Waked's arrest, Waked travelled only twice to Colombia. To the extent that a delay occurred because the DEA failed to apprehend Waked on his first trip to Colombia in February 2016, this failure points, at best, to mere negligence. Waked presented no convincing evidence of bad faith on the part of the Government. To the contrary, the Court finds that the Government acted in good faith at all times.

Further, Waked repeatedly insisted that the section on extradition procedures in the Department of Justice's Criminal Resources Manual requires the Government to seek extradition "as soon as his or her location becomes

known unless the effort would be useless." In other words, according to Waked, the Government was obligated to seek extradition in Canada because the Government knew of Waked's travels to Canada and because extradition from Canada was not futile. But Waked miscalculates the legal significance of the manual, which carries no "force of law." *United States v. Castronuovo*, No. 10-80149-CR, 2012 WL 7050590, at *2 n.1 (S.D. Fla. Dec. 14, 2012) (Matthewman, J.) ("But the U.S. Attorneys' Manual, although designed to serve as a guide for federal prosecutors, does not have the force of law. Accordingly, a defendant has no legal remedy if a prosecutor violates provisions of the manual." (citing *San Pedro v. United States,* 79 F.3d 1065, 1070 (11th Cir. 1996))).

Certainly, Waked argued that the Government should have pursued numerous alternatives to extradition. However, the standard for determining whether the proffered reasons support the delay is not whether "the government may have been able to do more." *Spaulding*, 322 F. App'x at 946. Instead, the Court must analyze whether the Government engaged in "continuous, good-faith efforts" to arrest Waked. *Id.* The Court finds that the Government in fact did investigate carefully the best path to a prompt and sure extradition and acted on its plan as soon as logistically possible. In *United States v. Hayes,* where there was a five-year delay between indictment and the trial, the Eleventh Circuit highlighted the Government's "persistent and dogged efforts" as a reason to not weigh the delay against the Government. 40 F.3d 362, 366 (11th Cir. 1994).

Finally, the Government sufficiently justified the three-year pre-indictment delay. Government investigators spent several years investigating the long-term and complex scheme of circular financial transactions at issue. Their investigation produced an unknown number of documents from banks in the United States, over 250,000 business documents from the grand-jury subpoena, and almost 12,000 documents from Panamanian banks. The Government did not have all of the available documents until late 2014. Ultimately, the Government had to piece together the often difficult-to-obtain and nearly unreadable evidence required to understand and prove the charged crimes—which understandably necessitated a lengthy pre-indictment investigation.

Waked asserts that the Government should have realized much sooner that the documents it received from the first MLAT request were incomplete. Waked highlights the Government's admission during a December 2013 ex parte application to toll the statute of limitations of the substantive counts that "[t]his should have been done back in 2010, and it just was not done by the United States." (Mot. at 3, ECF No. 66.)   Yet, again, this admission points to negligence and does not show any bad faith on the part of the government.

The Court finds that the reasons for the delay in arresting Waked do not weigh heavily against the Government. *Spaulding*, 322 F. App'x at 947; *See United States v. Knowles*, 390 F. App'x 915, 929 (11th Cir. 2010) (holding that the post-indictment delay attributable to the government did not weigh heavily against the government where the defendant failed to provide compelling evidence of bad faith on the part of the government); *United States v. Kresler,* 392 F. Appx' 765, 770–71 (11th Cir. 2010) (holding, in a case involving extradition that "'a more neutral reason [for the delay], such as negligence, does not necessarily tip the scale in favor of the defendant . . ." (quoting *United States v. Bagga,* 782 F.2d 1541, 1544 (11th Cir. 1986))).

### D. Defendant's assertion of his speedy trial right

"[A] defendant has some responsibility to assert a speedy trial claim." *Barker*, 407 U.S. at 529. Here, Waked has asserted his rights to a speedy trial. However, the Court notes that Waked caused a portion of the post-arrest delay by filing an unnecessary request for clarification from the Colombian Ministry of Justice. Regardless, this factor weighs against the Government. The Court also notes that it is highly speculative that Waked would have waived extradition from Canada. In Colombia, there is no chance of obtaining a bond pending extradition and the pre-extradition detention conditions are not pleasant. Had he been arrested in Canada and learned of the high likelihood of a bond being granted and the chance to delay extradition for 5 to 10 years, he may very well have opted to fight extradition.

### E. Prejudice to the defendant

Because the first three factors do not weigh heavily against the Government, Waked must show actual prejudice. *United States v. Knowles*, 390 F. App'x 915, 929 (11th Cir. 2010) ("[U]nless the first three *Barker* factors all weigh heavily against the government, the defendants must demonstrate actual prejudice." (quoting *United States v. Mitchell,* 769 F.2d 1544, 1547 (11th Cir. 1985))); *United States v. Clark*, 83 F.3d 1350, 1354 (11th Cir. 1996) (holding that a seventeen-month delay as a result of the Government's negligence did not excuse the defendant from the requirement to demonstrate actual prejudice). "In order to prove actual prejudice, the accused must demonstrate one of the following: (1) oppressive pretrial incarceration, (2) anxiety and concern, or (3) possible impairment of his defense." *Spaulding*, 322 F. App'x at 947. The anxiety or concern experienced by the defendant must have resulted from the delay. *United States v. Wells*, 160 F. App'x 885, 890 (11th Cir. 2005).

Waked failed to demonstrate actual prejudice. Surely, as Waked testified, the conditions in the Colombian jail were difficult. All the same, while the Government chose to arrest Waked in Colombia based on its analysis of the

extradition process, the Government did not force or encourage Waked to travel to Colombia. Waked made that choice himself, and any difficulties encountered in his incarceration in a deficient Colombian jail do not give rise to actual prejudice. *United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992) ("While we might agree that the conditions under which [the defendant] was confined in Colombia were inferior, we have already noted that [the defendant's] presence in Colombia was attributable to no one but himself. Thus, we are unpersuaded by [the defendant's] arguments that he was prejudiced by this incarceration.").

Next, during the period of delay—the time between the date of the indictment and the date of Waked's arrest—the indictment was sealed, and Waked remained entirely unaware of the proceedings against him. Waked cannot show that the delay caused any anxiety and concern. *Clark*, 83 F.3d at 1354 (finding the anxiety-and-concern prong of the actual prejudice analysis inapplicable because the defendant "was not in custody nor aware of the federal charges against him during the delay"). Waked mentioned that his arrest in front of his family traumatized his daughter and that he lost weight during the first three months of his detention in the Colombian jail. But this testimony fails to show that these manifestations of anxiety resulted from the delay.

Finally, as the Government notes, Waked cannot demonstrate that any delay impaired Waked's ability to build a defense. Waked and his attorneys were aware of the Government's investigation when Star and Global received grand jury subpoenas to produce records in 2009. The Government has provided to Waked all of the documents obtained through the grand jury subpoenas and MLAT requests, and Waked has pointed to no specific missing exculpatory documents. Vida Panama's attorney testified that he successfully located records of cash transactions between 2006 and the present—which means that even if records before 2006 are no longer available, Waked still has eleven years of records that ostensibly illustrate a pattern of compliance. Further, because an alleged connection existed between Star Textiles and Vida Panama and Star Textile's records had been subpoenaed, Vida Panama should have known to save any records in its possession and control. Its failure to do so is not the result of a pre- or post-indictment delay.

Thus, in the absence of actual prejudice, Waked cannot show a speedy trial violation.

### 3. Conclusion

Waked has not shown that all four factors weigh in his favor. *Ingram*, 446 F.3d at 1336; *Barker*, 407 U.S. at 530. Accordingly, the Court **denies** Waked's motion to dismiss the Indictment (ECF No. 66).

**Done and Ordered** in Miami-Dade County, on July 25, 2017.

_____
Robert N. Scola, Jr.
United States District Judge