UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20189-CR-SCOLA
Magistrate Judge Otazo-Reyes

UNITED STATES OF AMERICA

vs.

NIDAL WAKED HATUM,

    Defendant,

_____/

GOVERNMENT'S RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM

    Defendant Nidal Waked has filed a sentencing memorandum with which he seeks to support a downward variance in his sentence. The United States submits this Response in opposition to any downward variance, and recommends a sentence at the high end of the applicable guideline range.

<u>History and Characteristics of the Defendant</u>

    The major portion of the defendant's memorandum appears to be an obvious play for sympathy. The United States does not doubt that the defendant's family has suffered as a result of his incarceration. However, that is hardly a factor that separates this defendant from the multitude of other defendants who receive sentences within, and not below, the guideline range. A large portion of defendants have families, many wholly innocent of wrongdoing, who suffer as a result of the defendant's crimes and consequent punishment. This is unfortunate but this defendant's family is in no different a situation than innumerable others. They are suffering as a

direct result of the defendant's decision to engage in criminal activity, over an extended period of time, not as a result of the requirement that the government and the court uphold the rule of law.

The defendant also describes in much detail the nature and success of his father's and other relatives' business ventures. The successes of family members engaging in profitable businesses has nothing whatever to do with the sentence to be imposed on the defendant.

## Charitable Contributions

The defendant's description of his charitable contributions should not be considered by this court. Given his extraordinary wealth at the time of these offenses, the examples he provides are not a distinguishing mark. There is certainly no indication that his charitable contributions were so large as to constitute a sacrifice on his part. Moreover, Sentencing Guideline § 5H1.12 states that "civic, charitable, or public service; employment-related contributions; and similar good works are not ordinarily relevant in determining whether a departure is warranted."

## Oppressive Incarceration

The defendant argues that he merits a lesser sentence because of time he spent in the bad conditions of a foreign prison awaiting extradition. This argument is without merit and should be denied. While the government agrees to counting the time spent awaiting extradition in calculating the defendant's sentence, the incarceration abroad does not warrant a lesser sentence, and the government has never agreed that conditions in Picota are so bad as to merit a variance.[1]

In United States v. Pressley, 345 F.3d 1205, 1218-19 (11th Cir. 2003), the Eleventh Circuit, citing United States v. Carty, 264 F.3d 191 (2d Cir. 2001), held that harsh conditions of

---

[1] The defendant mischaracterizes a statement AUSA Frank Tamen made in court (Def. Mem. at 9). AUSA Tamen did not acknowledge that conditions abroad are "unduly harsh" but rather pointed out that this argument has been made many times before, usually to no avail, and expressed pride in the U.S. prison system.

confinement *could* provide a basis for a lesser sentence. However, the Pressley court did *not* hold that the "extraordinary" conditions alleged in that case – which involved six years of presentence confinement, five of which years were spent in a 23-hour-a-day lockdown, and where the defendant testified that he had not been outside for five years – warranted a lower sentence, but rather remanded the case to the district court to allow it to exercise its discretion. Pressley, 345 F.3d at 1218-19. Likewise in Carty; on remand the sentencing court denied a downward variance on claims of alleged prison conditions harsher than those claimed by this defendant (including being kept with three other inmates in a four by eight foot cell with no lights or running water, and limited to one phone call a week). See United States v. Teyer, 322 F. Supp. 2d 359, 378 n.9 (SDNY 2004).

In fact, courts have routinely rejected variances based on confinement conditions abroad. See United States v. Naranjo-Ramirez, 402 Fed. App'x 576 (2d Cir. 2010) (affirming sentence in which district court declined to grant a reduction for harsh conditions during the defendant's pre-extradition confinement at Combita prison (the predecessor prison to La Picota)); Rickenbacker v. United States, 365 F. Supp. 2d 347, 351-52 (E.D.N.Y. 2005) (alleged conditions of rat-infested food did not meet requirement of showing conditions of confinement were "extreme to an exceptional degree"); United States v. Teyer, *supra*, (denying departure request based on conditions at a Belizean jail described as "an extraordinarily harsh environment filled with fear, danger, violence, rape and corruption," and noting that defendant must present "evidence of truly horrific conditions"). There are few counter-examples where courts have granted lesser sentences due to harsh incarceration conditions. In one such rare example, in United States v. Noriega, 40 F. Supp. 2d 1378 (SDFL 1999), Judge Hoeveler reduced Manuel Noriega's sentence to twenty years in part because at the time he had spent nine years incarcerated under conditions that were

3

close to solitary confinement.  (It should be noted that Noriega was sentenced under the pre-guidelines law.)

Furthermore, courts that have examined this issue have placed the burden squarely on the defendant to prove conditions justifying a variance, see United States v. Johnson, 413 Fed. App'x 320, 322 (2d Cir. 2010).  To satisfy that burden, the defendant must show that (1) the conditions of his confinement were "extreme to an exceptional degree" and (2) those conditions fell upon him "in some highly unique or disproportionate manner."  Teyer, *supra* at 377.  The defendant in this case wholly fails to meet this burden.

First, as far as proving the facts justifying a variance, there is already evidence in the record that contradicts the defendant's self-serving allegations.  The Speedy Trial hearing presented proof on this issue.  The defendant's own Colombian extradition expert described some of the conditions of the extraditees in La Picota, such as that there was over-crowding, and criminals who had committed all kinds of crimes could share the same yard, unit or "even the same cell[.]"  Transcript of July 19, 2017, at 122.  But the defense expert admitted that he was unable to say whether such over-crowding was better or worse than conditions in U.S. jails.  Moreover, there were some benefits to prisoners in Colombia that were not available to U.S. prisoners, such as inmates being able to receive food, clothing and conjugal visits from family members who could visit the prison. Id. at 125-26.  At the same hearing, the government's expert on Colombian extraditions testified that "hundreds and hundreds" of extraditees have passed through La Picota on their way to the United States and that American Citizen Services (a unit of the U.S. embassy that attends to needs of U.S. citizens in Colombia) had visited La Picota prison at times when U.S. citizens were incarcerated there, and never found grounds to tell Colombian authorities that they should not use La Picota.  Transcript of June 20, 2017 (afternoon) at 49-50.  Thus the only proof that has been

presented on the defendant's incarceration at La Picota, over-crowding and undesirable cellmates, falls far short of the standard necessary to show conditions of confinement that were "extreme to an exceptional degree."[2]

Second, even if the defendant's allegations were true, they do not amount to the type of "extreme to an exceptional degree" conditions that merit a reduction, nor were they conditions that fell upon him in a "highly unique or disproportionate manner." Every inmate in the prison could have had a cellmate who was a violent criminal or could have witnessed acts of violence. Those are the hallmarks of many prisons, including those in the United States. Similarly, every inmate at La Picota would have had to contend with purportedly cold or foul water.

Finally, the defendant's request for special consideration of the time he spent awaiting extradition is particularly specious because almost half of the time the defendant was incarcerated in La Picota was of his own making as a direct result of his filing an appeal of his extradition order. See Transcript of July 19, 2017, at 129-36; see also D.E. 257 (Order denying Speedy Trial Motion) at 10 ("the Court notes that Waked caused a portion of the post-arrest delay by filing an unnecessary request for clarification from the Colombian Ministry of Justice"). For all these reasons, the Court should deny the defendant's request for a lesser sentence due to conditions of confinement at La Picota prison.

---

[2] The defendant claims that pictures in his brief "clearly depict[]" a 70-pound weight loss (Def. Mem. at 9). The government disagrees. One of the pictures shows the defendant to be thinner than the other two but it is hardly clear how much thinner, nor is it unusual for an inmate to lose some weight in a prison. It should also be noted that the "weight loss" picture is from an interview he gave to the Colombian press and highlights yet another liberty the defendant was granted while incarcerated in Colombia which he would not have had in the United States.

Nature of the Offense and Risk of Loss

The defendant's arguments about how there was neither loss nor risk of loss to the victim banks actually supports the government's argument that the defendant should be sentenced at the top of the guidelines range rather than below it.  His whole argument is directed at minimizing his criminal intent and the risks to his victim posed by his conduct.  Officials of ICBC have made very clear to the United States that they would *never* have authorized the loans involved in this case had they known of the fraudulent representations.  Had the facts that the bank was loaning money, to be wired outside of Panama, without it being used for purchases of merchandize, become known to Panamanian banking regulators, the consequences to ICBC could have been severe.  Not only would the bank have been subject to legal sanctions by Panamanian regulators, its business reputation would have been damaged for being involved. Even if an investigation eventually cleared it of culpability, the stain on its reputation for caution and responsibility would remain. Such an occurrence has very real financial repercussions to a bank extensively involved in international finance.  Indeed, bank officials have expressed to the United States their great dismay and the reputational harm they have suffered as a result of being involved in the defendant's scheme even though their participation was unwitting.

Hence the defendant's assertion that he should receive a more lenient sentence because his scheme posed not "even a mere scintilla of actual, intended or risk of loss" is quite erroneous. Rather than supporting a downward variance, it represents his minimization of the impact of his offense and its potential consequences.  Such an attitude would be consistent with a risk of recidivism and supports the government's argument for a sentence at the upper end of the guideline range.

It is also misdirected. Many offenders concoct schemes to defraud banks in order to obtain fraudulent loans, with the intent and the expectation that they will be able to re-pay them before their schemes are discovered. Obviously, events often do not follow their expected course - witness, for example, the monumental losses incurred from fraudulent loans on real estate during the time of the boom and speculation of the first decade of this century. Even the victims were often surprised by the financial losses from what so many thought were risk-free loans extended to offenders who had no expectation of losing the money, or of the collapse that followed.

It is therefore imperative that the law provide a deterrent to *all* fraudulent loan applications, not just the ones in which the risk was apparent from the inception. It is for that very reason that Sentencing Guideline § 2B1.4(b)(14)(A) and (D) (*2008 ed.*) provide an enhancement for receiving more than one million dollars in funds from a financial institution, and a minimum offense level of 24, *regardless of loss or risk*. This court should not undercut this carefully considered sentencing provision. Following a theory of "all's well that ends well" is a formula guaranteed to encourage fraud by those convinced they have a fail-safe scheme.

## Office of Foreign Assets Control (OFAC) Impact

The defendant seeks to wrap all of his and his family's legal difficulties into the ambit of this case. The OFAC action is an example. Neither the defendant's relatives nor most of his corporations were indicted in this case. They were subjected to OFAC sanctions because the Treasury Department conducted its own extensive investigation and developed a basis to impose sanctions independent of this prosecution. While the timing and existence of the indictment in this case were linked to the OFAC action, the latter has been maintained on a separate basis. No grand jury information from this case has been shared with OFAC. Moreover, OFAC has advised the defendant that his guilty plea, sentencing, and any prospective forfeiture in the criminal case will

be considered as just one step toward resolving the OFAC sanctions, and additional separate issues will still need to be addressed directly with the Treasury Department. Accordingly, the OFAC sanctions were not a apart of this prosecution and should not be considered as a punishment already imposed. It should especially be noted that financial consequences suffered by the defendant's relatives, as a result of their own involvement in sanctionable activities, is not relevant to this defendant's sentence.

## Acceptance of Responsibility

The defendant's argument that the fact that he chose to "abandon" meritorious legal defenses and entered into a plea agreement should support a downward various is frivolous. Like nearly all other defendants, he should receive a three level reduction for acceptance. Unlike nearly all other defendants, he accepted responsibility only after filing and litigating, including through evidentiary hearings, at least seventeen motions to dismiss the indictment or exclude the government's evidence. It was not until after this court had ruled largely or entirely against him on most of his motions that he decided to pursue plea negotiations.

Moreover, the defendant's decision to enter a plea agreement was not a one-sided gesture of repentance on his part. He received a significant benefit. The United States agreed to abandon significant aspects of the charges, which could have resulted in a much more severe sentence if proven, in exchange for the defendant's guilty plea.

## Non-Citizen Status

The defendant's status as a non-citizen who is not eligible for a United States visa is not an appropriate factor to support a downward variance. The defendant acknowledges that his United States visa was revoked in 2004, which was years before the Drug Enforcement Administration opened the investigation that led to this prosecution. Obviously, another agency of the United

States government obtained information about the defendant that led them to conclude he should not be allowed to enter this country, nor should his wife. The issues he addresses in this section are largely unrelated to his commission of this offense, because his inadmissibility pre-dated this prosecution.

The defendant makes a number of claims that are simply unsubstantial. Any actions that might or might not be taken by the government of Canada are purely speculative and not grounds for a variance. The defendant's eligibility to serve part of his sentence in a halfway house, were he not an alien, is also irrelevant. No defendant is guaranteed to be allowed into such a program. Nor is there any guarantee he would be designated to a camp instead of a Federal Correctional Institution. This court should not base a sentence on guesswork about what might happen to the defendant if he were of a different status.

## Conclusion

The defendant engaged in a scheme to defraud that continued over a period of years, involving very large sums of money. Any of his multitude of fraudulent transactions, if discovered by banking regulators in Panama, would have had a major detrimental effect on the business and reputation of his victim. Indeed, even as an unwitting victim, ICBC has suffered damage to its reputation and undesirable publicity. Because such frauds can easily do such damage, the Sentencing Guidelines call for a significant level of punishment, *regardless of loss*, as a deterrent. The court should not undermine that purpose.

The defendant's status as a wealthy businessman, who took over a prosperous business developed by his father, should not be a factor mitigating his sentence. Poverty does not excuse crime; neither should riches. The defendant should be sentenced at the upper level of the guideline range, to 51 months.

>
> Respectfully submitted,
>
> RANDY HUMMEL
> ATTORNEY FOR THE UNITED STATES
> ACTING UNDER AUTHORITY CONFERRED
> BY 28 USC § 515
>
> By: /s/ Frank H. Tamen
> FRANK H. TAMEN
> Assistant United States Attorney
> Florida Bar No. 0261289
> 99 NE 4th Street, Ste. 700
> Miami, Florida 33132
> Tel: (305) 961-9022
> Fax: (305) 536-7213
> Frank.Tamen@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, on December 15, 2017.

> */s/ Frank H. Tamen*
> Assistant United States Attorney